Murray Glackman v. Commissioner.
Glackman v. Commissioner
Docket No. 28377.
United States Tax Court
1951 Tax Ct. Memo LEXIS 29; 10 T.C.M. (CCH) 1132; T.C.M. (RIA) 51353; November 30, 1951
*29 Income: Net worth basis: Living costs: Medical expenses. - The petitioner established that he incurred liabilities in the taxable years which are not reflected in the respondent's net worth statement, that his living expenses were less than the amounts added to income by the respondent, and that medical expenses were not less than the amount claimed. Held, that there are no deficiencies and no liability for a fraud penalty. Albert B. Bernstein, Esq., for the petitioner. Percy C. Young, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and 50 per cent penalties for the years and in the amounts as follows: 50% Fraud
Year
Deficiency
Penalty
1942
$ 2,097.15
$ 1,048.58
1943
3,599.82
1,799.91
1944
1,944.85
972.43
1945
4,450.08
2,225.04
1946
9,401.53
4,700.77
$21,493.43
$10,746.73
The issues are whether the petitioner had income in the taxable years as shown by the respondent's construction of the petitioner's net worth, plus the amounts of alleged living expenses, and whether any part of the determined deficiencies is due to fraud with intent *30 to evade tax. Findings of Fact The petitioner is an individual who resides at Miami Beach, Florida, and filed his returns for the calendar years 1942 to 1946, inclusive, with the Collector of Internal Revenue for the District of Florida. The petitioner moved to Florida in September, 1941. He carried with him about $10,000 in cash which represented savings from his wages over a period of some 16 years, proceeds of sales of a business and house and furnishings, cash wedding gifts, and wife's savings. The petitioner did not have a bank account. It had been his practice to keep his funds in cash in a safe in his house in New York, which safe he had sent to him in Florida after he acquired a house there, and in which he thereafter kept his funds. He had an automobile worth $1,100. Shortly after moving to Florida, the petitioner and another individual, as partners, acquired the business of the L. C. Bar at Miami Beach at a cost of $5,000 of which each partner contributed $2,500. The L. C. Bar was a comparatively small place, with a frontage of about 18 feet and depth of 25 feet. Within it was a liquor package shop six or seven feet square. At the bar there were 18 or 20 bar stools. *31 There were no tables. There were two full-time employees, both bartenders, one of whom worked in the daytime and the other at night. Cleaning was done by a part-time porter. At irregular times there was a piano player in the place. There were no other employees. The L. C. Bar was in one of the poorer sections of Miami Beach. Its sales were mostly sales of beer. The whiskey drinks that were sold were largely of the less expensive brands. All sales in the L. C. Bar were rung up on a cash register at the time of sale. The amount of the total sales for each day was transcribed into a cash book in which were also recorded the daily purchases and other expenditures. At the beginning of 1944, the petitioner engaged the services of an accounting firm which opened and maintained a double entry set of books consisting of a cash journal and ledger in which were recorded the financial transactions of the L. C. Bar. The L. C. Bar did not have a bank account. Except for exchanges of small quantities of liquor with another bar, which was owned by the petitioner's father-in-law, all transactions of the L. C. Bar were by cash. In 1942, the petitioner borrowed $5,000 from his father, and in 1943 *32 he borrowed another $5,000 from his father. In both instances the loans were made in cash which the petitioner placed in his safe. The $10,000 so loaned to the petitioner had not been repaid by him at the end of the year 1946. In 1942, the petitioner purchased his partner's interest in the L. C. Bar for the sum of $2,500. The petitioner was thereafter the sole owner of the business until he sold it in 1946. In 1942, the petitioner's father-in-law purchased a house on North Bay Road on which he made a down-payment of $4,150. There was a mortgage of $8,500 on the property. The father-in-law purchased the property for the petitioner and the petitioner's wife and transferred title to the petitioner. The petitioner agreed to repay to his father-in-law the down-payment of $4,150 but has never done so. The petitioner made payments of $1,000 on the mortgage in each of the years 1943 and 1944. The balance on the mortgage, $6,500, was paid by the petitioner's father-in-law in 1945 when the property was sold. In the years 1942, 1943, and 1944, the petitioner expended the sum of $2,264.76, $4,442.19, and $6,601.29, respectively, for improvements to the premises on North Bay Road. From the *33 time the petitioner acquired the North Bay Road property through 1946, his father-in-law and mother-in-law lived with the petitioner and his family. The father-in-law and mother-in-law paid a larger portion of the living expenses of the two families than was paid by the petitioner. In 1945 and 1946, the petitioner's father and mother also lived with the petitioner and his family. The father and mother did not pay rent to the petitioner, nor for any food. The living expenses paid by the petitioner were not more than $2,500 in each of the years 1942 to 1945, inclusive, and $4,000 for the year 1946. In 1943, the petitioner purchased a lot in LaGorse Golf Subdivision. The total purchase price was $4,200, of which $1,200 was paid at the time of purchase and the balance was represented by a mortgage in the amount of $3,000. The mortgage was paid off in 1944 and 1945. The gain on the sale of the petitioner's residence in 1945 amounted to $10,821.42. The non-taxable portion thereof, with adjustments for tax and insurance prorations amounted to $5,706.17. In 1946, the petitioner purchased another residence on LaGorce Drive. The total purchase price was $42,500 of which $15,455.94 was *34 represented by a mortgage on the property. The difference was paid in cash by the petitioner, and in order to meet that payment he borrowed $15,000 from his father-in-law. Later in 1946, the petitioner sold the L. C. Bar and from the proceeds of the sale he repaid to his father-in-law the sum of $10,000. In 1946, the petitioner's father-in-law purchased an uncompleted bowling alley, and engaged the petitioner to complete it and operate it. The father-in-law advanced funds to the petitioner in the amount of $3,491.25 to be used for completion of the alley, which amount the petitioner deposited in a checking account. The funds so advanced were paid out by checks drawn by the petitioner to complete construction and furnishing of the bowling alley. No part of the amount so advanced to the petitioner belonged to him and no part was ever devoted to his own uses. In the year 1946, the petitioner was afflicted with a condition of partial paralysis which affected various muscles in his head, including cheek, eye, and jaw muscles. He consulted two physicians and eventually, within the year 1946, he had an operation performed in a hospital in New York City by a surgeon who specialized in *35 that type of work. In connection with his illness in 1946, the petitioner paid fees to physicians, hospital bills, costs of pre-operative examinations, and post-operative treatments, all of which aggregated not less than $2,400. The petitioner's net worth at the end of the year 1941, and at the end of each of the taxable years was as follows: 1941
$11,100.00
1942
10,278.51
1943
10,115.79
1944
$12,517.64
1945
25,147.30
1946
23,933.71
For the taxable years 1942 to 1946, inclusive, the petitioner reported in his Federal income tax returns aggregate net income in the amount of $26,885.31. In the taxable years, all of the petitioner's taxable income was realized from operations of the L. C. Bar and from the sale of the residence on North Bay Road. No part of the deficiency determined by the respondent was due to fraud with intent to evade tax. Opinion ARUNDELL, Judge: The respondent determined the deficiencies in this proceeding upon the basis of his conclusion as to the increase in the petitioner's net worth, plus cost of living expenses. At the trial, counsel for the respondent stated that in determining the deficiencies the correctness or incorrectness *36 of the petitioner's purchases and sales and expenses in his operation of the L. C. Bar were not taken into consideration. The use of the increase in net worth method of determining income has been sustained in cases of failure of the taxpayer to maintain adequate records, , and failure to produce records, , aff'd. on this point, . This case, however, differs from those cases and others in which the increase in the use of net worth has been sustained. In this case, the petitioner's principal source of income was from sales at his bar-room. As to those sales, he had records and the respondent did not find error in them in determining the deficiency, nor through any evidence at the trial, although there was considerable examination of witnesses as to the accuracy of the records. A comparison of the amount of the petitioner's assets, at January 1, 1942, as determined by the respondent, with assets at December 31, 1946, shows an increase over the intervening period of some $62,000. But such a comparison does not reveal the true facts, nor all of them, as developed *37 by the evidence. The respondent starts out with listing the petitioner's assets consisting only of one automobile of a value of $1,100. The parties are agreed as to this value. The testimony of both the petitioner and his wife is that the petitioner had, in addition to the automobile, $10,000 in cash when he went to Florida. The source of the funds was given in the testimony which was not shaken on cross-examination. In subsequent years, the petitioner's assets increased, but so did his liabilities. The respondent, neither in the notice of deficiency, nor upon brief, takes into consideration any liabilities except those represented by mortgages on real estate. Yet the uncontradicted evidence is that the petitioner was indebted to his father in all of the taxable period in a minimum amount of $5,000 and a maximum of $10,000. Further, the petitioner was indebted to his father-in-law for loans amounting to as much as $15,650. The most substantial increase in the petitioner's net worth was in the year 1945. In that year, he sold his residence at a gain of over $10,000. The portion thereof that was includible in income as capital gain was reported by the petitioner in his return for the *38 year of sale and tax was paid thereon. The portion of the gain that was not includible in income should not be taxed in the guise of constituting increase in net worth. For the year 1946, the respondent includes in his statement of net worth the amount of $3,491.25, which sum was in a bank account in the petitioner's name. This deposit has been explained by satisfactory evidence as being funds that did not belong to the petitioner but represented funds advanced to him to be used, and which were used, for a special purpose. In determining the deficiencies, the respondent estimated the petitioner's living expenses as amounting to $4,000 for each of the years 1942 and 1943, $5,000 for 1944, $6,000 for 1945, and $8,000 for 1946. The petitioner testified that such expenses were not more than $2,500 for each of the years 1942 to 1945, and $4,000 for 1946. Under other circumstances, the petitioner's figures would appear to be low considering the size of his family. However, in this case it is established that a substantial part of what would otherwise be expended by the petitioner for the support of himself and family was absorbed by his father-in-law. It is our conclusion that upon a *39 proper weighing of the petitioner's assets and liabilities the increases in net worth did not exceed the amounts of income reported in the several years. Accordingly, the respondent erred in his determination of deficiencies. It follows from our conclusion as to the proposed deficiencies that there is no amount due upon which to base fraud penalties. We may add, however, that the respondent has failed to establish fraud. One of the items relied upon to establish fraud is the amount of medical expenses claimed by the petitioner for the year 1946. The respondent made some inquiry at the office of the surgeon who operated on the petitioner and at the hospital where the operation was performed. The amount of the expenditures ascertained by the respondent at those two places was somewhat less than the amount claimed by the petitioner. However, the respondent does not claim that his investigation was complete nor that the figures ascertained upon his inquiries covered all of the petitioner's medical expenses. On the other hand, the petitioner testified in considerable detail as to consultations with several physicians and as to pre-operative and post-operative treatments, the costs of *40 none of which are included in the respondent's figures. We decide the fraud issue against the respondent. Decision will be entered for the petitioner.